## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RAYMOND BALESTRA, individually and on behalf of all others similarly situated,

                              Plaintiff,

v.

CLOUD WITH ME LTD., GILAD SOMJEN, and ASAF ZAMIR,

                              Defendants.

C.A. No. _____

**CLASS ACTION**

**CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(A)(1) AND 15(A) OF THE SECURITIES ACT OF 1933**

Plaintiff Raymond Balestra ("Plaintiff"), individually and on behalf of all other individuals and entities similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act"), the following, based upon knowledge with respect to himself and his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: documents and solicitation materials disseminated by Defendants (defined below) in connection with the Cloud ICO (defined below), public statements made by Defendants concerning the Cloud ICO, and other publicly available articles and materials relating to the Cloud ICO.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.     Plaintiff brings this action on behalf of himself and all other individuals and entities similarly situated against Cloud With Me Ltd. ("Cloud"), Gilad Somjen ("Somjen"), and Asaf

Zamir ("Zamir, and together Zamir, the "Individual Defendants") (collectively, "Defendants") for violation of Sections 12(a)(1) and 15(a), 15 U.S.C. §§ 77l(a)(1), 77o(a), of the Securities Act.

2.      Specifically, in connection with the Cloud initial coin offering, which began on approximately July 25, 2017 and is ongoing as of the date of this Complaint (the "Cloud ICO"), Defendants have raised at least $10 million in bitcoin ("BTC"), ethereum ("ETH"), fiat and other virtual currency investments[1] by offering and selling unregistered securities, in the form of Cloud Tokens ("CLD Tokens"), in direct violation of the Securities Act.

3.      The purported primary purpose of the Cloud ICO was to raise capital to fund "the global Deployment of GridNodes infrastructure for migrating the web into a decentralized cloud." Plainly stated, the Cloud ICO was meant to fund the creation of a decentralized "cloud" network in which millions of individual users could become part of a decentralized grid by sharing resources on their personal computing devices for others to use.  Defendants dubbed this new decentralized grid they planned on creating the "Crowd Cloud."

4.      In connection with the Cloud ICO, Defendants released a white paper (the "White Paper") which described various aspects of Cloud's business model and purported benefits to purchasing CLD Tokens.  The White Paper claimed that CLD Tokens would derive their value primarily from becoming "the standard currency for the emergent decentralized cloud services ecosystem, governing contribution-based pro-rata payments, clearing and distribution of financial

---

[1] The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering, and in which the United States is a member, describes "virtual currency" as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction." Importantly, virtual currencies do not have legal tender status like real currencies (*e.g.*, U.S. dollar and the Euro). The most widely used virtual currencies are BTC and ETH.

benefits to the new role players of the Crowd Cloud."  As the CLD Tokens purportedly became the "standard currency" for such services, it was expected to rise in value.

5.     Participants in the Cloud ICO were sold the opportunity to make a return on their investment by (1) receiving CLD Tokens from renting out resources on their personal computing devices when, or if, the "Crowd Cloud" was created; or (2) trading CLD Tokens on virtual currency exchanges for a profit.

6.     In an effort to further entice investors to invest in the Cloud ICO, Defendants made various claims to the public that the value of CLD Tokens was set to significantly increase due to its immediate "liquidity."  For example, on July 25, 2017, the Company issued a press release on PRNewswire entitled, "Cloudwith.me Launches ICO to Bring the Next Generation of Cloud to 'The Rest of Us.'"  This press release stated that the CLD Token would be able to be "used immediately upon the close of the ICO to pay for Cloud services from one of the world's largest cloud providers . . . [which was] anticipated to create significant demand for the services and subsequently token liquidity."

7.     From July 25, 2017 through August 25, 2017, Defendants ran the "official" Cloud ICO, during which Defendants offered 30 million CLD Tokens for $10 each, payable in BTC and ETH in North America and via credit cards and bank wire transfers elsewhere.  During the "official" Cloud ICO, the Company raised at least $10 million in exchange for CLD Tokens (far less than the $300 million they sought).  Following the "official" Cloud ICO, the Company then entered into a period it described as the "regular token sale and token distribution."  The "Cloud ICO" as used herein includes both the "official" ICO and the "regular token sale."  As of the date of this Complaint, the Company continues to offer and sell CLD Tokens to the general public via its token sale website.

8.      Defendants made sure to construct the Cloud ICO to align their financial interests alongside the interests of CLD Token purchasers.  Specifically, the Company reserved 27.6 million CLD Tokens for itself and 2.4 million CLD Tokens for the Company's "management & employees."  While Defendants have represented that the CLD Tokens to be dealt out to company insiders would be subject to a "12-month lockup period," Plaintiff is unaware as to whether Defendants have actually honored such commitment.

9.      The Cloud ICO was a clear offer and sale of securities because, *inter alia*, Plaintiff, and other similarly situated investors: (i) invested money; (ii) into a common enterprise (Cloud and the expected "Crowd Cloud"); and (iii) with the expectation of receiving CLD Tokens which would increase in value and produce substantial returns.  Additionally, the failure or success of the Cloud Crowd was entirely dependent on Defendants' managerial efforts.

10.     Tellingly, Defendants have frequently referred to token purchasers as "investors." For example, on August 2, 2017, Cloud published a "sponsored story" on a virtual currency news website entitled, "'Cloud Me'" Announces Cloud Token ICO, Works Cloud Solutions."  This article stated that the Company was "holding a pre-ICO, where investors [could] gain a 17% pre-order bonus on the purchased cloud tokens."  The article concluded by stating that the "platform invites investors to become part of the crowdsale by visiting the official Cloud token web page."

11.     Given the fact that Defendants have been unsuccessful in creating the Crowd Cloud they promised, the CLD Tokens that Plaintiff and the Class purchased in the Cloud ICO have not generated the value or income-generating properties that investors believed they were purchasing.

12.     The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration, issuers of securities are able to tout their investment opportunities with no

limitations whatsoever.  For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners.

13.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, the Cloud ICO was, and has been at all times, been an offer and sale of unregistered securities and thus, Defendants are strictly liable under Section 12(a)(1) of the Securities Act.

14.     Importantly, proof of Defendants' calculated deprivation of investors' rights and protections under the federal securities laws is not required or determinative as to Plaintiff's claim. This is because Defendants are liable simply by virtue of having offered and sold unregistered securities during the Cloud ICO.   Nevertheless, Defendants' clear intentional attempt to circumvent registration requirements under the Securities Act are outlined herein to stress the urgency and need for immediate judicial intervention to preserve Plaintiff's and other Cloud ICO investors' significant financial interests which Defendants currently control, and to rectify existing and future irreparable harm to Plaintiff and Cloud ICO investors.  For these reasons, Plaintiff on behalf of himself, and all similarly situated Cloud ICO investors, seeks compensatory, injunctive, and rescissory relief, which would provide rescission and repayment of all investments into the Cloud ICO, as well as secure and conserve such funds until repayment.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Plaintiff alleges violations of Sections 12(a)(1) and 15(a) of the Securities Act.

16.     This Court has personal jurisdiction over each of the Defendants because each has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

**PARTIES**

*Plaintiff*

18.     On August 5, 2017 and August 17, 2017, respectively, Plaintiff expended 2.800462 ETH and 3.9042891 ETH to purchase 103.70135 CLD Tokens and 92.66 CLD Tokens.  As of June 9, 2018, Plaintiff's 196.36135 CLD Tokens were worth approximately 0.0111925 ETH, representing a loss of 6.6935586 ETH, or 99.8% of his initial investment.  In terms of USD, as of June 9, 2018, Plaintiff's 196.36135 CLD Tokens were worth approximately $6.87.  In contrast, the 6.7047511 ETH Plaintiff invested in the Cloud ICO were worth approximately $4,022.85, which also represents a loss of 99.8% of Plaintiff's initial investment.

*Defendants*

19.     Cloud is an Irish Private Company Limited by Shares that was incorporated on or

about October 7, 2016.   The Company's principle place of business is located at 39 Northumberland Road, Ballsbridge, Dublin 4, D04 H1F3, Ireland.   Cloud is a reseller of cloud services offered by large providers such as Google and Amazon.   Cloud also claims to be creating a decentralized cloud dubbed the "Cloud Crowd."

20.     Somjen is Chief Executive Officer ("CEO") and a co-founder of Cloud.   Somjen describes himself as an "online marketing expert, serial entrepreneur and tech investor."   Somjen actively promoted the sale of CLD Tokens in the Cloud ICO through interviews, promotional videos, and presentations to the public.

21.     Zamir is the Chief Technology Officer and co-founder of Cloud.   The CLD Token has been referred to as the "brainchild" of Zamir.   Zamir actively promoted the sale of CLD Tokens in the Cloud ICO through interviews, promotional videos, and presentations to the public.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action individually and as a class action on behalf of all individuals and entities who transferred to Cloud any virtual or fiat currency to invest in the Cloud ICO (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant.

23.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

24.     While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in this Class.   All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

25.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*: (i) whether Defendants offered and sold unregistered securities in violation of the federal securities laws; (ii) whether Plaintiff and other Class members will suffer irreparable harm if such securities laws violations are not remedied; and (iii) whether the Class is entitled to compensatory, injunctive, and/or rescissory relief as a result of Defendants' wrongful conduct as alleged herein.

26.     Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff does not have any interests adverse to the Class.  Additionally, Plaintiff and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

27.     Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

28.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

29.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

31.     Accordingly, Plaintiff seeks compensatory, rescissory, injunctive, and other equitable relief on behalf of himself and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### Background on Blockchain Technology and ICOs

32.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed.  The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in the chain.  After this process is complete, another block is created with additional information and so on and so forth.

33.     To date, most "blockchains" are used to record transactions involving virtual currencies, e.g., BTC and ETH. However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

34.     An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies

35.     To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain.  Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights

***Cloud's Founding, Business Model and ICO***

36.     The Individual Defendants claim to have founded Cloud in 2015.  Somjen and Zamir have had full control over Cloud at all relevant times.

37.     The Individual Defendants have been heavily involved in all aspects of Cloud's operations throughout the Cloud ICO, including managing the Company's day-to-day activities and marketing.

38.     Defendants announced the Cloud ICO in July 2017.  On July 25, 2017, Cloud issued a press release claiming that "$5 million" worth of CLD Tokens had already been purchased and that the Company's goal was to raise $300 million.  This press release also stated that Cloud created the "first 'ICO for all'" as it enabled "contributions via credit card, bank transfer, and cryptocurrency."  That same day, the official Cloud Twitter account posted a Tweet stating: "Getting ready to change the way we Internet . . . Don't miss your chance => token.cloudwith.me."

39.     No registration statement was ever filed with the SEC in connection with the Cloud ICO or CLD Tokens.  Indeed, the White Paper included the following lengthy disclaimer proclaiming as such:

> *THE TOKENS REFERRED TO IN THIS WHITE PAPER HAVE NOT BEEN REGISTERED, APPROVED, OR DISAPPROVED BY THE US SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION IN THE UNITED STATES OR ANY OTHER REGULATORY AUTHORITY NOR HAVE*

*ANY OF THE FOREGOING AUTHORITIES EXAMINED OR APPROVED THE CHARACTERISTICS OR THE ECONOMIC REALITIES OF THIS TOKEN SALE OR THE ACCURACY OR THE ADDEQUACY OF THE INFORMATION CONTAINED IN THIS WHITE PAPER UNDER, THE U.S. SECURITIES ACT OF 1933 AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OF AMERICA OR ANY OTHER JURISDICTION.*

(Alteration in original.)

40.      The Company ran the Cloud ICO in order to fund its creation the Crowd Cloud and reach its objectives, which it enumerated as follows:

- To decentralize the provisioning of cloud services, migrating from a global infrastructure operated by a small group of hyperscale service providers to a blockchain-based peer-to-peer infrastructure operated by millions of small individual providers and contributors of cloud resources.

- To simplify the use of professional cloud services for all levels of web users turning such services into a commodity product universally accessible and utilized by the general public.

- To monetize the new decentralized cloud services ecosystem with a dedicated cryptocurrency governed by a smart contract enabling automated and trusted reconciliation of payments between all peer-to-peer cloud services providers. It is a market estimated to reach $195 billion in 2020 by IDC.

41.      In other words, Cloud claimed to be creating a decentralized cloud wherein anyone could participate and generate revenue and the Cloud ICO was simply a way for Defendants to raise capital to fund this project.

42.      The Cloud ICO consisted of a public offering of 30 million CLD Tokens.  In the early stages of the Cloud ICO, the offer was 1 CLD Token for $10 payable in ETH, BTC, or fiat currency.  As the Cloud ICO progressed, the offer and sale of CLD Tokens was for a variety of prices in exchange for numerous virtual and fiat currencies.

43.      According to the White Paper, there would be a maximum of 60 million CLD Tokens "issued" and no "other means" of increasing the amount of CLD Tokens would "apply to the Cloud Token post ICO."  These claims led investors to believe that the due to the permanent

cap on available CLD Tokens, increased demand for the tokens would significantly increase the value of each CLD Token.  According to the White Paper, the remaining CLD Tokens would be set aside for the Company's "reserve" (similar to treasury stock) or distributed to "Management & Employees" (similar to incentive-based awards or stock or options).

44.     The "official" Cloud ICO ran between July 25, 2017 and August 25, 2017.  In July 2017, Defendants released the White Paper which highlighted the purpose of the Cloud Crowd, Cloud's business model, and the terms of the Cloud ICO.  Investors acquired CLD Tokens using BTC, ETH, and fiat currencies (such as EUR, and USD) via Cloud's website.

45.     Defendants claimed that the CLD Token would be used to facilitate payments on the Crowd Cloud.  If the Crowd Cloud was created, and had it been widely adopted, demand for the CLD Token was expected to significantly increase, thereby increasing the CLD Token's market price.  In the Company's words, the "Cloud token is the key component governing the financial ecosystem surrounding the new Crowd Cloud."

46.     The White Paper stated that the CLD Token would "evolve during its lifetime into several instances where a new version of cloud with smarter contracts and more efficient cloud services payments governance will match the growth and expansion of the [Crowd Cloud] both in volume and sophistication."  Simply put, the Company claimed that it would create new CLD Tokens with more features over time and that CLD Token holders would have the "inherent right to replace (by choice) each existing coin of previous generation into a new one at no cost."  Thus, investors expected that CLD Tokens would be so widely used that the CLD Token itself would be forced to "evolve" to keep pace with demand.

47.     The foregoing core message was received by potential and actual investors in the Cloud ICO.  For example, on or about September 4, 2017, a "guest article" was published on a

currency exchange website entitled "4 Reasons Why Cloud Token Cryptocurrency Will Succeed." This article stated that CLD Token's "price may start to skyrocket due to buyer demand in the token that aims to finally decentralize cloud services" and listed the "four reasons" CLD Token would "succeed" as: 1. "Decentralized Cloud Services"; 2. "Earning Potential"; 3. "Immediate Liquidity"; and 4. "You Can Now Buy Tokens With a Credit Card."

48.     Defendants made a halfhearted attempt to obscure the fact that the Cloud ICO was clearly an investment opportunity.   For example, the White Paper includes a disclaimer proclaiming that the Cloud ICO purportedly did not "constitute an offer or invitation to any person to subscribe for or purchase shares, or rights or any other securities in the Company."

49.     Similarly, Defendants made feeble attempts to avoid words such as "invest" in touting the CLD Token as an investment opportunity.  Rather than simply state that CLD Tokens would purportedly have significant demand, and thus increase in value, Defendants frequently stated that the CLD Token was expected to have "significant liquidity."

50.     For example, Cloud claimed that the CLD Token was "expected to gain significant liquidity due to its immediate implementation in the Company's services."[2]   Similarly, on September 3, 2017, Cloud issued a press release entitled "Ethereum Based Cloud Token Set to Decentralize and Revolutionize Cloud Services Starting Now" (the "September 3rd Press Release").   In this press release the Company stated that the "overwhelming interest in Cloud Token [was] due (in part) to the immediate liquidity" because "[i]nvestors [could] already use tokens to buy AWS and Microsoft Azure cloud services . . . ."   Such language was obviously

---

[2] The "services" the Company referred to were those provided pursuant to Cloud's primary business in which it essentially resells other companies' cloud services.  Stated otherwise, Cloud customers can go to the Company's website and indirectly purchase cloud services from companies such as Google and Amazon.  Given the fact that this "service" is of little use, CLD Tokens have not gained "significant liquidity."

designed to lead investors to believe there would be increased demand for CLD Tokens, which in turn would increase the price of the CLD Token.

51.     Defendants also made efforts to convince Cloud ICO participants that CLD Tokens would have "significant liquidity" by frequently touting that the CLD Token would be listed on multiple virtual currency exchanges.  For example, on August 28, 2017, the official Cloud Twitter account submitted a public reply to a potential investor in which it stated: "We plan to make the Cloud token available for trade on most of the major cryptocurrency exchanges. Not enough characters so will DM you list."[3] Similarly, the September 3rd Press Release stated that CLD Token was "scheduled to hit multiple cryptocurrency exchange sites" on "September 21, 2017."

52.     Despite Defendants claims to the contrary, they were fully aware that the Cloud ICO and offer and sale of CLD Tokens was an offer and sale of securities.  This fact is painfully obvious given the fact that the Company dubbed the CLD Token's "ticker" as "CLD" and even conducted a "Cloud Token Roadshow" on August 15, 2017:

---

[3]     Cloud was stating that there was not enough room to state all of the virtual currency exchanges CLD Token would be listed on so it would send the potential investor a list via direct message.



53.    Furthermore, Defendants issued a type of stock certificate called "Token Purchase Certificate" to Cloud ICO investors.   For example, Plaintiff received the following, partially redacted, "Token Purchase Certificate" memorializing his August 17, 2017 investment:



54.     Similarly, Defendants also took efforts to assure investors that the fall in CLD Token's value was momentary and it would rise again.  For example, on December 19, 2017, Plaintiff emailed the Company requesting an explanation for why CLD Tokens were, at that time, worth $0.40 each when the tokens were sold for $10.00 each during the Cloud ICO.  Plaintiff stated, that he "should have been told as an early investor that [Cloud's] sale price would be under a dollar."  In response, a Company representative stated:

> The early days of other cryptocurrencies saw the same fluctuation.
>
> It's nature of all currency, fiat and crypto.
>
> CLD goes up and down in value every day.
>
> No one is monitoring it more than us.

55.     Despite such assurances, CLD Token's value has continued to plummet and as of the date of this Complaint each CLD Token is worth between $0.03 and $0.04.

56.     The Cloud ICO never closed and CLD Tokens are still available for purchase on Cloud's website.  For example, as of the date of this complaint, the Cloud website has the following page which can be used to purchase CLD Tokens directly from the Company (where each token is sold for double the price of CLD Tokens sold on the open market):



*CLD Tokens Constitute "Investment Contract" Securities*

57.     The facts are indisputable that Defendants participated in the offer and sale of CLD Tokens.  Similarly, it is indisputable that the value of the CLD Token has at all times been dependent of whether Defendants could successfully create and manage the Crowd Cloud.  The Crowd Cloud was to be developed, operated, and maintained by Defendants.  Given that the Cloud ICO was conducted by Cloud, it is indisputable that the Company was instrumental in orchestrating and operating the Cloud ICO.  Similarly, Somjen and Zamir, as the Company's co-founders and top executives, clearly controlled and orchestrated Cloud's actions in conducting the Cloud ICO.

58.     Under the federal securities laws, the definition of a security includes an "investment contract."  Plaintiff's and the Class' investments of BTC, ETH, and other fiat or virtual currencies to purchase CLD Tokens constituted an investment of money in an "investment contract."

59.     When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiff and the Class invested their virtual currencies and fiat currency in order to receive CLD Tokens, which Plaintiff and the Class reasonably expected would appreciate in value and generate a profit. Specifically, the CLD Tokens were expected to provide value by way of using them in connection with the Crowd Cloud or trading them for profit.  Such economic value to be received by Plaintiff and the Class has at all times been entirely dependent on Defendants' technical and managerial efforts to fully develop and launch the Crowd Cloud, solicit additional investments in CLD Tokens and get the CLD Token listed on virtual currency exchanges.

60.     The value, and existence, of the CLD Tokens and the Crowd Cloud have at been at all times entirely dependent on Defendants' actions.  In fact, the White Paper explicitly states as a "RISK" that "[i]t is possible that, due to any number of reasons, including without limitation, the failure of business relationships or the emergence of competing intellectual property claims [Cloud] may no longer be a viable business and may dissolve or fail to launch."  Similarly, th White Paper also states that there is a "[r]isk of software not meeting expectations," meaning that if Defendants are unable to make the Crowd Cloud, then CLD Tokens will have little to no value.

61.     Accordingly, it is obvious that any success from creating the CLD Token and future potential increases to the CLD Token's value was entirely dependent on Defendants' actions.

62.     Further, Plaintiff and the Class invested in the common enterprise that is Cloud and the Crowd Cloud project.  That is, Cloud ICO investments were pooled under the control of the Defendants, and the success of the Crowd Cloud and CLD Tokens -- and thus the potential profits stemming from the mass adoption of Cloud's decentralized Crowd Cloud, which was expected to ultimately effect the value and utilization of CLD Tokens -- was entirely reliant on Defendants'

actions.   Additionally, as stated in the White Paper, 46% of the CLD Tokens available were reserved for the Company and 4% for "management."   Accordingly, it is obvious that any potential value ascribed to the CLD Token was expected to be for the Individual Defendants' personal benefit in addition to Plaintiff's and the Class' benefit.

63.     Furthermore, it is abundantly clear that Defendants were fully aware that they were selling unregistered securities and depriving public investors of their rights and protections under the federal securities laws.   For example, despite the fact that Defendants deprived Plaintiff and the Class of their rights and protections under the federal securities laws, they attempted to protect themselves using the safe-harbor protections for registered issuers providing "forward-looking statements" under these same laws.   For example, the Cloud White Paper included a disclaimer entitled "FORWARD-LOOKING STATEMENTS" which stated, in part:

> *Some of the statements in the White Paper include forward-looking statements that reflect the Company's and/or the Management [sic] current views with respect to product development, execution roadmap, financial performance, business strategy and future plans, both with respect to the Company and the sectors and industries in which the Company operates. . . .*

(Alterations in original.)

64.     Unfortunately for Defendants, such safe-harbors are not available for issuers selling unregistered securities.   Evidently, Defendants were attempting to reserve protections for themselves under the federal securities laws whilst simultaneously depriving Plaintiff and the Class their rights and protections under the same laws.   Such actions demonstrate the clear inequity of Defendants' actions in connection with the Cloud ICO.

***Necessity for Judicial Intervention***

65.     On July 25, 2017, the SEC issued a report on "the DAO," which offered tokens for sale online, in which the SEC advised those using "distributed ledger or blockchain-enabled means

for capital raising, to take appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration. On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and to be mindful that promoters and initial sellers that lead buyers of tokens to expect a return on their investment or participate in shared returns provided by the project may be offering a security for sale.

66.     On September 29, 2017, the Wall Street Journal reported Chairman Clayton as stating "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security." This statement sums up the core issue here quite succinctly. Digital currencies are a relatively new phenomenon and various parties are taking advantage of the time it takes for regulatory agencies to address new developments to engage in unlawful conduct with near impunity, as Defendants have here by raising tens of millions of dollars with promises of profits and income-generating opportunities stemming from supposedly efficient mining facilities, many of which have yet to materialize.

67.     On December 1, 2017, the SEC filed a complaint against PlexCorps for selling unregistered securities in connection with the "PlexCoin Token" ICO. Similarly, on December 11, 2017, the SEC announced that it had shut down an ICO that Munchee, Inc., a California-based online food review company, had been planning on conducting. Since January 2018, the SEC has initiated at least three additional actions against ICO operators alleging they offered and sold unregistered securities.

68.     Defendants have promoted the Cloud ICO by indicating that the value of CLD Tokens was likely to significantly increase and repeatedly stressing the multiple ways investors could use of CLD Tokens to generate income and profit. The value of CLD Tokens was at all

times expected to result from Defendants' ability to create the decentralized Crowd Cloud. Plaintiff and the Class believed Defendants' claims that the CLD Token would "become the standard currency for the emergent decentralized cloud services ecosystem" and Plaintiff's and the Class' expectations of what their CLD Tokens would be worth were, in large part, based on the veracity of such representations.

69.     Further, given the fact that Defendants sought to raise $300 million to fund the creation of the Crowd Cloud and clearly raised significantly less than this amount, it is reasonable to infer that Defendant's knew, or should have known, that their ability to create the Crowd Cloud was unrealistic.  Indeed, had Defendants registered their securities they likely would have thought twice, and then a third time, about ensuring they solicited investments using more realistic business plans.  Moreover, had Defendants registered their offering, the SEC would have reviewed their issuing documents for, among other things, logical inconsistencies such as unrealistic claims (*e.g.*, how could Cloud build the Crowd Cloud when they apparently raised less than 10% of the amount initially sought to construct the platform), prior to such documentation being approved for use in soliciting public investments.  However, Defendants consciously chose not to register the Cloud ICO or the CLD Tokens and their unlawful conduct in offering and selling unregistered securities in connection with the Cloud ICO has harmed Plaintiff and the Class.

70.     Investors like Plaintiff and the Class have already been wrongfully deprived of the protections of the federal securities laws by Defendants.  Fortunately, the private right of action provided for by Section 12(a)(1) of the Securities Act was created for just this type of situation, and provides strict liability for the sale of unregistered securities.

## CLAIMS FOR RELIEF
## COUNT I

### Claim for Violation of Section 12(a)(1) of the Securities Act
### Against All Defendants

71.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

72.     Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5 and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

73.     From July 25, 2017 through to and including the date of this Complaint, in connection with Cloud ICO, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of the Securities Act. Specifically, Somjen and Zamir conducted the Cloud ICO through Cloud's website.

74.     The offer and sale of CLD Tokens in the Cloud ICO constituted the offer and sale of unregistered securities under controlling federal law.  CLD Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any CLD Tokens, an investment of money, in the form of BTC, ETH, and/or fiat or other virtual currencies was required; (b) the investment of money was made into the common enterprise that is Cloud and Defendants' Crowd Cloud project; and (c) the success of the investment opportunities and any potential returns thereon were entirely reliant on Defendants' ability to create the decentralized Crowd Cloud, solicit investments in the Cloud ICO and get the Cloud Token listed on virtual currency exchanges.

75.     As such, Defendants have participated in the offer and sale of unregistered securities in violation of the Securities Act and are liable to Plaintiff and the Class for rescission and/or compensatory damages.

## COUNT II

**Claim for Violation of Section 15(a) of the Securities Act
Against the Individual Defendants**

76.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

77.     Due to their ownership in and/or control over Cloud, the Individual Defendants acted as controlling persons of Cloud within the meaning of Section 15(a) of the Securities Act as alleged herein.  By virtue of their positions as co-founders and top executives of Cloud, and participation in and/or awareness of Cloud's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making relating to the Cloud ICO, including the decision to engage in the sale of unregistered securities in furtherance thereof.

78.     By virtue of the foregoing, the Individual Defendants are liable to Plaintiff and the Class as control persons of Cloud under Section 15(a) of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.     Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

C.     Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

23

D.      Preliminarily enjoining Defendants from making further transfers or dissipations of the investments raised from the offer and sale of CLD Tokens in connection with the Cloud ICO, or using such funds in any further purchases or transactions;

E.      Requiring an accounting of the funds and assets raised from Plaintiff and the Class in connection with the Cloud ICO;

F.      Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

G.      Ordering rescission of the investments made by Plaintiff and the Class in the Cloud ICO and/or compensatory damages;

H.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

I.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

*[Signatures on the Following Page]*

Dated: June 19, 2018

Respectfully submitted,

**LAW OFFICE OF ALFRED G. YATES, JR., P.C.**

/s/     Alfred G. Yates, Jr.
Alfred G. Yates, Jr. (PA17419)
Gerald L. Rutledge (PA62027)
300 Mt. Lebanon Boulevard, Suite 206-B
Pittsburgh, PA 15234
Telephone: (412) 391-5164
Email: yateslaw@aol.com

**OF COUNSEL:**

**LEVI & KORSINSKY, LLP**
Donald J. Enright*
Elizabeth K. Tripodi*
John A. Carriel*
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Fax: (202) 333-2121
* *to be admitted pro hac vice*

*Attorneys for Raymond Balestra*